**In the Matter of LUDLOW VALVE MANUFACTURING CO., Inc., Debtor.**

No. 43028.

United States District Court
N. D. New York.

Feb. 10, 1960.

Arthur J. Harvey, Albany, N. Y., Justin J. Mahoney, Troy, N. Y., for trustees, John J. Purcell and Abraham C. Goldstein.

William R. Murray, Troy, N. Y., for petitioner-debtor. Javits, Moore & Trubin, Robert S. Warshaw, New York City, of counsel.

Cooper, Erving & Savage, Albany, N. Y., for secured creditor, James Talcott, Inc. Edward S. Rooney, Prescott C. Sook, Albany, N. Y., of counsel.

Harvey M. Lewin, New York City, for certain unsecured creditors.

JAMES T. FOLEY, District Judge.

Substantial and drastic developments in the affairs of the above debtor corporation have taken place since the filing and approval of the petition herein for reorganization under the provisions of Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. Such activity has been rapid fire and occurred over a short period of time. The petition was filed on January 27, 1960, approved on January 28, 1960; two trustees have been appointed and have duly qualified, and their selection of two attorneys approved on or before February 1, 1960.

The debtor corporation, Ludlow Valve Manufacturing Co. Inc., is almost a century old in the conduct of its affairs in the City of Troy. It has long been held, controlled and operated by prominent citizens and their families of that city. According to the balance sheet attached to the petition its current and fixed assets totalled $3,419,907, with an estimated total net worth of $1,419,029. According to the petition, at the time the operations of its plants in Cohoes and Troy were stopped by the seizure of the plants by a secured creditor, the firm had a payroll of approximately $30,000 a week and employed approximately four hundred and fifty people. This secured creditor, James Talcott, Inc. of New York City, doing business as a factor, had taken possession of the properties on a business day under its agreements with the debtor company. The amount of this loan at that time was slightly more than one million dollars, and the claim of the factor in taking possession was based upon alleged default in payment according to the terms of the loan agreements. The taking of such property by the factor was complete. Notices were posted on January 15, 1960 at the main plant telling the next shift of employees not to report for work. Signs were posted around the main plant in Troy to the effect it was the property of James Talcott, Inc. Pinkerton detectives were hired and stationed around the plant and security from unwarranted entrance was maintained to such degree that workers could not enter to regain their personal possessions. Entry could only be obtained by the grace and permission of the factor's employees and after the appointment of the trustees the factor refused to turn over the keys or possession of the plants of the debtor.

Under such existing conditions, the attorneys for the trustees obtained orders to show cause as to why the properties should not be turned over to the possession of the trustees and for the issuance of certificates of indebtedness in the amount of $300,000 with priority over existing obligations and administrative costs and expenses. These orders were returnable Thursday, February 4, 1960. Upon such return the startling developments that had taken place in the interim began to unfold.

The factor, on February 4, 1960, filed an answer to the petition controverting it in many respects. It also filed a petition to dismiss the turnover proceeding and a further answer contesting the right to issue certificates of indebtedness. Most important, at the same time, was filed a new petition on behalf of the debtor corporation, signed by Daniel Richman, as President, requesting that the original petition filed under Chapter X be amended to comply with the requirements of Chapter XI, 11 U.S.C.A. § 701 et seq., and deemed filed thereunder because adequate relief can be obtained under such Chapter XI.

This conglomeration of issues, in my judgment, necessitated full hearing, and such was held over a period of three days. The testimony revealed the controlling interest in the debtor corporation had been sold to one Daniel Richman of Cleveland, Ohio, now the new President, by a majority of the stockholders. One of these stockholders who so sold his substantial interest in the debtor was the attorney for the debtor corporation who presented the original petition under Chapter X and obtained the order of approval of such petition. The evidence disclosed that the sale of approximately 60% of the stock was made upon the payment of about $31,000 by Richman with

important guaranty by him for payment of substantial wage claims and taxes. This took place February 2 or 3, 1960. Daniel Richman testified at the hearing that he was most anxious to take over the operation of this historic company. His stated plans are to open immediately, rehire the labor force, invest money to improve the operation with the hope that the labor force will ultimately be substantially increased. He seemed most sincere in his expressions of good purpose and intent to rehabilitate this industry so important to Troy, open it immediately and to keep it operating with personal investment of his own money. He expressed confidence that under his management with his experience in this field, which is considerable, the business will be a profitable venture. On the last day of the hearings there was produced a written memorandum of understanding between the factor and Ludlow, with Daniel Richman, as President, containing new financial arrangements as to the payment of the substantial loan owed to the factor. Generally, there are sweeping concessions in such memorandum as to repayment with offer to advance up to a maximum of $300,000 under the security of present liens if Richman needs and cannot obtain such new money from other sources. Such offer is dependent upon the filing of a Chapter XI petition and an order authorizing Ludlow as debtor in possession to continue the business, with Daniel Richman as President and its new Board of Directors.

■ With this new turn of events, the facts must be carefully appraised to decide whether Chapter X or Chapter XI would better serve "the public and private interests concerned including those of the debtor". Securities and Exchange Commission v. United States Realty & Improvement Co., 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293; General Stores Corp. v. Shlensky, 350 U.S. 462, 465, 76 S.Ct. 516, 100 L.Ed. 550. Propriety of transferring proceedings from Chapter X to Chapter XI is a matter for the discretion of the Court after consideration of all the pertinent facts.

Securities and Exchange Commission v. Wilcox-Gay Corp., 6 Cir., 231 F.2d 859; In re Transvision, Inc., 2 Cir., 217 F.2d 243, 246, certiorari denied Securities and Exchange Commission v. Transvision, Inc., 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 744; Gleeson v. Carr, 9 Cir., 219 F.2d 64, 68; John Hancock Mutual Life Insurance Co. v. Casey, 1 Cir., 141 F.2d 104. Under the accomplished facts we now have present and the importance of the public interest, it is clear that the petition to amend to Chapter XI should be allowed to transfer in effect these proceedings from Chapter X to Chapter XI.

■ To keep this proceeding in Chapter X would obviously lead down a path fraught with danger. There would be many imponderables and obstacles along the way. There could be much legal delay which would keep people from work and endanger the fate of this needed industry. There are substantial questions involved in the turnover proceedings as to whether these plants were not turned over voluntarily and peaceably by the original attorney and Board of Directors of the debtor corporation. Property in possession of one asserting absolute ownership raises serious difficulty as to whether plenary or summary jurisdiction should be exercised. First National Bank in Houston, Texas v. Lake, 4 Cir., 199 F.2d 524, certiorari denied 344 U.S. 914, 73 S.Ct. 337, 97 L.Ed. 705; Duda v. Sterling, 8 Cir., 178 F.2d 428, 433–436, 14 A.L.R.2d 899; cf. Reconstruction Finance Corporation v. Kaplan, 1 Cir., 185 F.2d 791. The hard, cold fact is also present that in the formulation and approval of any plan under Chapter X, the secured creditor, the factor, may not be deprived of his security unless he receives payment in full or the substitute of the "most indubitable equivalence" of the rights he surrenders under any plan of reorganization. In re General Stores Corp., D.C.N.Y., 147 F.Supp. 350, 353; In re Murel Holding Corp., 2 Cir., 75 F.2d 941, 942. The factor could seriously impede the formulation of a plan under Chapter X. The issuance of certificates of indebtedness with the priority re-

quested is a delicate proposition. In re Third Ave. Transit Corp., 2 Cir., 198 F. 2d 703. This strong array of hurdles to the consummation of a plan in the Chapter X proceeding can only lead to the conclusion that Chapter XI is the common sense and practical solution. As Mr. Justice Douglas stated: "Common sense often makes good law." Peak v. United States, 353 U.S. 43, 46, 77 S.Ct. 613, 615, 1 L.Ed.2d 631.

Of course, there is always the danger in such fast business maneuvers as here that the interests of all will not be considered and an unfair selectivity will result. The balance should be kept true, otherwise the purposes of the Bankruptcy Act may be frustrated wittingly or unwittingly. It should be emphasized that the selection of Daniel Richman to own and control this company was made by interests in Troy that have run this business for many years. If there is any disenchantment, and I sincerely hope there will not be, it must be kept in mind that the decision to place Richman in control was not done by the decision of the Trustees appointed or by this Court. It is also well to point out that although the reorganization proceedings under Chapter X have been shortlived, great benefits have resulted. The protracted hearing was initiated and brought on solely by the legal process obtained from the Court by the attorneys for the Trustees. The hearings caused full disclosure of behind-the-scenes events, allowed the varied interests to be heard, and in effect, invoked for the protection of all the important safeguards of Chapter X in regard to deliberate investigation and report. Such hearing is the best way I know to try to insure fair play. At the same time, by such procedure, the integrity of the pleadings, processes and functions of this Court under the Bankruptcy Act is preserved.

The appointment of two distinguished citizens of Troy as trustees mainly to supervise, investigate and report, their selection of two attorneys who demonstrated their worth, competence and capacity before me during the vigorous hearings goaded the business interests involved to definite action and agreement. Negotiations for many months had failed to reach the result we now have and the impact of court process seems to have rejuvenated the interest of competent and experienced people at a time when it appeared that the industry was going to be allowed to sleep away to the detriment of Troy and its people.

The petition by the debtor corporation to amend is granted as requested. The orders to show cause and issues raised by the answer are dismissed as moot. Jurisdiction is expressly retained and reserved in this Court for the computation, award and payment of administrative costs and expenses, and reasonable compensation for services rendered.

It is so ordered.